## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| RANDOLPH REED, | : | |
| Plaintiff, | : | Case No. 3:13cv00317 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, | : | Chief Magistrate Judge Sharon L. Ovington |
| Acting Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I.    Introduction

Shortly after Plaintiff Randolph Reed completed his service in the Army in 1985,

he was involved in a motorcycle accident while in Germany.  (*PageID#* 161-62).  After

being airlifted by helicopter to a nearby hospital, Reed's injuries required him to have

steel rods installed in his back.  (*PageID#* 161).  Despite many difficulties, Reed went on

to work for many years as an electrician and electrician supervisor, before ultimately

needing to quit in 2005 due to worsening medical problems relating back to the 1985

motorcycle accident.  Reed later sought financial assistance from the Social Security

Administration by applying for Disability Insurance Benefits ("DIB") and Supplemental

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

Security Income ("SSI") in March 2007, alleging disability since March 30, 2005.  He alleges he is disabled due to partial paraplegia from hips down, arthritis in both hands, and high blood pressure.  (*PageID##* 378, 468).

After various administrative proceedings, Administrative Law Judge ("ALJ") Thomas McNichols, II, issued a partially favorable decision on June 28, 2012. (*PageID##* 77-93).  ALJ McNichols found Reed became disabled as of June 20, 2011, approximately six months after his insured status expired in December 2010.  (*PageID#* 79).  He denied Reed's DIB application but found Reed disabled for SSI as of June 20, 2011.  (*PageID#* 93).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Reed is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Response in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #7), and the record as a whole.

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony

Prior to the established disability onset date, Reed was a "younger individual age 45-49."  On June 20, 2011, Reed's age category changed to an individual "closely approaching advanced age," when he turned 50 years old.  *See* 20 C.F.R. §§ 404.1563, 416.963; *PageID#* 91.  Reed has a high school education, and past relevant work experience as an electrician and electrician supervisor.  (*Id.*).

2

At the administrative hearing held in May 2012,[2] Reed testified that he is 5' 10" and weighs approximately 285 pounds. (*PageID#* 104). He lives with his mother and his 12 year-old son at his sister's house. (*PageID#* 105). Reed has a driver's license but only drives to his son's extracurricular activities and the grocery store. (*Id.*). His sister drove him to the hearing. (*Id.*).

After graduating high school, Reed completed a five-year apprenticeship in the electrical trade and worked as an electrician. (*Id.*). He also testified he was in the Army from November 1979 to January 1985. (*PageID#* 106). Reed alleges that he became disabled in March 2005. (*Id.*). Reed was working full-time as an electrician in a supervisory position until the job was eliminated. (*PageID#* 107). Reed testified he was unable to go back to being a laborer because he could not do the ladder work. (*Id.*).

Reed tried to go back to work in 2006 or 2007 but testified he was not even able to complete one full workday because of trouble with his back. (*Id.*). Reed testified he is still having trouble with his lower back, as well as hips. (*Id.*). He testified the back pain is due to steel rods in his spine. (*Id.*). Reed testified he receives treatment from the VA, including physical therapy and pain management. (*Id.*). Reed testified he takes pain medication and uses an electronic stimulator for the pain. (*Id.*).

Reed also testified that his history of partial paraplegia dates back to 1985 and has progressively become worse, specifically regarding his bowels and bladder. (*Id.*). He

---

[2] Reed also testified at a hearing held before ALJ McNichols in February 2010. (*PageID##* 134-72). However, in light of the similar testimony subsequently provided at the May 2012 hearing with ALJ McNichols, only a detailed summary of the May 2012 hearing is provided herein.

testified he uses a cane "[a]ll the time," and is only able to take short steps without it but he has to "[get] to a wall . . . or something . . . in case I lose my balance." (*PageID#* 109). Reed also has pain and lack of feeling in both legs. (*Id.*). He testified that he previously had been burned on his leg but did not even know until he felt blood. (*PageID#* 110). Reed testified the has lack of feeling in his back side, his private area, and his feet. (*Id.*). He stated doctors have said there is nothing they can do for him but provide him with pain medication. (*Id.*). Reed testified his partial paraplegia is also causing him incontinence, he has to always make sure his bladder is empty, and he needs to wear pads. (*Id.*).

Reed further stated that he has problems with depression and anxiety. (*PageID#* 111). He "just want[s] to be alone and . . . away from people." (*PageID#* 112). He testified his 12 year-old son "understands my problem" and "takes care of me a lot." (*Id.*). Reed stated his son "knows when to be away and when to come help his dad out." (*Id.*). Reed is in group counseling at the VA, which he stated is helpful. (*PageID#* 113).

Reed testified his pain is daily and constant. (*PageID#* 115). He takes three Percocets per day for his pain. (*Id.*). On a scale of 0 to 10, where 0 is no pain and 10 is the worst pain imaginable, Reed rated his back pain on a typical day as a 6. (*Id.*). He further added, "It's bad. I can feel it throbbing; it's way up to my shoulders." (*PageID#* 116). He stated his leg pain is "more of [a] burning sensation," and rated it as a 4 out of 10. (*Id.*). The pain also goes into his calves and knees. (*Id.*). Reed testified he feels the most comfortable while resting in the fetal position, on his side, in bed. (*PageID#* 117).

4

He wakes up often throughout the night in order to roll over and shift positions.  (*Id.*).

Reed can only stand for about 5 to 10 minutes without his cane before needing to lean against something or sit down.  (*PageID#* 118).  He testified he can only sit for approximately 20 minutes at a time.  (*Id.*).  He can walk less than 100 yards with his cane. (*Id.*).  He is able to use his arms, hands, and fingers.  (*Id.*).  He can lift dishes while unloading the dishwasher but is unsure if he can lift a gallon of milk by himself, because his son always goes with him to the grocery store and lifts the heavier items.  (*PageID#* 119).  Reed is able to climb steps, "slowly and carefully."  (*Id.*).

Reed does not believe he can do any type of work because of his need to stand up and sit down, his constant fidgeting, and incontinence.  (*PageID#* 119).  Reed testified that he is able to load and unload his dishwasher, can use a small electric vacuum sweeper on his floors, and do laundry, but is unable to make beds.  (*PageID#* 120).  As for hobbies, Reed testified he enjoys grilling meat on the back porch.  (*Id.*).  He stated he does not go to church, does not visit friends or relatives, does not participate in any kind of sports, does not do yard work or gardening, has not taken any trips out of state in the last year, and does not drink alcohol, smoke cigarettes, or use any controlled substances. (*PageID#* 122).  He is able to feed, dress, and groom himself.  (*Id.*).

On a typical day, Reed testified that he wakes up at 6:00 a.m., wakes up his son, prepares something to eat, and gets his son off to the bus stop by 7:00 a.m.  (*Id.*). Afterwards, Reed rests in his bedroom until about 10:00 to 11:00 a.m. before waking up and doing some straightening up around the house.  (*PageID#* 123).  Reed testified that

5

his son returns home from school around 2:00 p.m., at which time he helps him do "whatever I can do for him."  (*Id.*).  Reed sometimes will go to watch his son play Little League and feels "fortunate – where he plays and practices recently, I can just pull my car up, and I sit in my car to watch his games and stuff.  I don't have to get out."  (*PageID#* 123).  Reed testified he sometimes listens to music, does not use a computer, but watches television a lot.  (*PageID#* 124).

### B.    <u>Vocational Expert Testimony</u>

A Vocational Expert ("VE") also testified at the hearing.  She classified Reed's past employment as an electrician as medium, skilled work, and as an electrician supervisor as light, skilled worked.  (*PageID#* 127).

The ALJ presented a hypothetical question to the VE based on Plaintiff's age, education, work experience, and residual functional capacity ("RFC").  (*Id.*).  He asked the VE to assume such a hypothetical individual had the following restrictions:

> no climbing of ropes, ladders, or scaffolds; occasional climbing of stairs and balancing; frequent stooping, kneeling, crouching, and crawling; no work on uneven surfaces, not required to maintain concentration on a single task for longer than 15 minutes at a time, . . . jobs requiring little if any concentration; and lastly, no exposure to hazards such as dangerous machinery, unprotected heights, things of that nature.

(*PageID#* 127).  The VE testified that there are approximately 35,000 jobs that fit the hypothetical, including, at the light level, electronic workers, mail clerks, warehouse checkers, and information clerks.  (*PageID#* 128).  The VE testified there are approximately 6,000 sedentary positions available, including bench assemblers,

surveillance system monitors, weight testers, and charge account clerks. (*Id.*). When asked by the ALJ to also include a limitation allowing the hypothetical individual with the opportunity to alternate between sitting and standing at 30-minute intervals, the VE testified that approximately 23,000 of the 35,000 jobs she previously identified at the light level would remain and there would be no change at the sedentary level. (*Id.*). The VE testified the same examples she provided would still apply. (*Id.*).

If adding an additional limitation allowing for the hypothetical individual to use a cane for ambulation only, the VE testified approximately 15,000 of the 23,000 jobs would remain, and there would be no change to positions available at the sedentary level. (*Id.*). When asked by the ALJ to add an addition limitation requiring "ready access to restroom facilities, . . . and . . . no exposure to the general public and no assembly line work," the VE testified approximately 8,000 of the 15,000 light level jobs and 3,000 of the 6,000 sedentary jobs would remain. (*PageID#* 129). The VE testified bench assemblers and surveillance system monitor would be eliminated, but weight tester and charge account clerk would remain. (*Id.*). The VE further testified that based on the hypothetical, and without transferable skills, Reed could not do any of his past work. (*Id.*).

When cross-examined by Plaintiff's counsel, the VE stated that if an individual with the limitations previously set forth also needed to leave the workstation and be off task for 10 to 15 minutes per hour, she is "unable to identify competitive employment with that type of a scenario." (*PageID#* 130). If the individual needed to miss work regularly, as often as three times a month, the VE testified this would also interfere with

the individual's ability to maintain employment.  (*PageID#* 131).

### C.   <u>Relevant Medical Opinions</u>

On March 2, 2007, Reed's treating physician, Barbara Bennett, D.O., completed a Basic Medical Form.  She indicated that Reed had hypertension; chronic back pain; two Harrington rods in his back; fecal and urinary incontinence; ulcerative colitis; and migraines.  (*PageID#* 604).  She listed him as being in poor but stable condition.  (*Id.*). Dr. Bennett opined that Reed's ability to stand, walk and sit was affected.  She found Reed could frequently lift/carry up to 10 pounds; was markedly limited in his ability to push/pull, bend, reach, and handle; and extremely limited in his ability to perform repetitive foot movements.  (*PageID#* 605).  Dr. Bennett believed Reed to be unemployable.  (*Id.*).

On May 21, 2007, Dr. Aivars Vitols, an orthopedic surgeon, evaluated Reed at the request of the State agency.  Dr. Vitols noted that Reed "uses a cane as well as a walker for assistive ambulation, which is done for only short intervals and periods."  (*PageID#* 610).  He noted that Reed had surgery on his left shoulder in 1992 and removal of bone spurs from his lumbar spine, also in 1992.  (*PageID#* 611).  Dr. Vitols indicated that Reed "presents with very poor balance.  He is unsteady at station."  (*PageID#* 613).  He also noted that Reed's "lower extremities reveal poor muscle tone and weakness right and left."  (*PageID#* 614).  Dr. Vitols' impression was partial paraplegia, lower extremities status post fractured spine; bowel and bladder incontinence; colitis as per history; hypertension, as per history.  (*Id.*).  He stated that Reed's "work capabilities and tasks of

8

daily living are affected accordingly." (*Id.*). At the request of the State agency, the record was reviewed in June 2007 by non-examining physician, Dr. Anton Freihofner. He noted that Reed "had no difficulties noted at the district office. His neurological testing at the CE was normal in all aspects of sensation and reflexes. His weakness of the lower extremities is nonspecific and there is no atrophy. He alleges bladder and bowel difficulties but is not on any medications for the same and he does not self-cath." (*PageID#* 619). Dr. Freihofner opined that he would "give him a medium RFC with frequent stooping due to the rod fixation from T11 to L4." (*Id.*). However, in his actual RFC dated 7/19/2007, Dr. Freihofner concluded Reed could perform light work activity. (*PageID#* 628). He opined that Reed could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; and could frequently balance, stoop, kneel, crouch, and crawl. (*PageID#* 623). Another non-examining physician, Dr. Rebecca R. Neiger, reviewed the record at the request of the State agency and affirmed Dr. Freihofner's assessment, as written. (*PageID#* 629).

Reed treated with Dr. Martin Schear, M.D., beginning in October 2007. (*PageID#* 634). Dr. Schear indicated that Reed had an antalgic gait on exam. (*Id.*). He told Reed he was unable to work for the next year. (*Id.*). On February 4, 2008, Dr. Schear completed a Basic Medical Form, in which he indicated that Reed was markedly limited in his ability to push/pull and bend, and moderately limited in his ability to reach. (*PageID#* 636). He believed Reed was unemployable for between 30 days and 9 months. (*Id.*). He noted Reed's condition was poor but stable. (*PageID#* 635).

9

On July 28, 2008, Dr. Michael Puthoff completed a Basic Medical Form indicating that Reed had diffuse lumbar tender points, atrophied calf muscles, and decreased great toe sensation.  (*PageID#* 664).  He had chronic lumbar pain, lumbar radiculopathy, hypertension, and GERD.  (*Id.*).  His health status was noted to be poor but stable.  (*Id.*). Dr. Puthoff noted that Reed's ability to push/pull, bend, reach, and make repetitive foot movements were markedly limited.  (*PageID#* 665).  Dr. Puthoff believed Reed was unemployable for 12 months or more.  (*Id.*).  In January 2010, Dr. Puthoff completed another Basic Medical form.  (*PageID#* 961).  He indicated Reed's condition was poor but stable; he could not stand, walk, or sit during an 8-hour workday; could frequently lift up to 5 pounds; and was extremely limited in his ability to push/pull and bend.  (*Id.*).  He noted Reed was unemployable for 12 months or more and that his observations were based on x-rays and examination.  (*Id.*).  On April 4, 2011, Dr. Puthoff completed another Basic Medical form.  (*PageID#* 958).  He indicated Reed could stand/walk for 2 hours in an 8-hour day, for 15 minutes without interruption.  (*PageID#* 959).  He indicated Reed could sit for 8 hours in an 8-hour workday, without interruption.  (*Id.*).  Reed was noted as markedly limited in his ability to push/pull, bend, reach, and make repetitive foot movements.  (*Id.*).  He was not significantly limited in his ability to handle.  (*Id.*).  He could lift up to 10 pounds frequently.  (*Id.*).  Dr. Puthoff indicated Reed was unemployable for 12 months or more.  (*Id.*).

At the request of the State agency, Reed was evaluated by Dr. Donald Kramer, Ph.D., on July 29, 2011.  (*PageID#* 944).  Reed indicated that his main work limitations

are physical in nature and relate to the motorcycle accident in 1985.  (*Id.*).  Reed stated

that his injuries "really got worse as I got older.  I have two rods in my back.  I go to the

VA for treatment.  I have some partial paralysis.  I have to walk with a cane.  I have

problems walking, standing, bending, and lifting.  I'm in constant pain.  I have arthritis in

my spine.  I've lost bowel and bladder control because of my spinal cord injury.  I don't

have feeling in my legs."  (*Id.*).  Dr. Kramer noted that Reed "appears to be a reliable

informant.  He seemed to be open and honest in sharing information in today's

examination, and his self-report appeared to be consistent with the clinical impression

obtained in today's interview."  (*PageID#* 947).  Dr. Kramer did not find Reed to have

any real restrictions in his ability to work based on psychological problems, although he

does note Reed has some problems with depression, irritability, and frustration tolerance.

(*PageID#* 948).

On August 18, 2011, Reed was evaluated by Dr. Amita Oza at the request of the

State agency.  (*PageID#* 950).  Dr. Oza opined that Reed:

> complains of back pain since 1985.  He was involved in motorcycle accident
> where he had three compression fractures of his vertebra and has two Harrington
> rods.  Pain is continuous, 6/10 in intensity with Percocet that he takes regularly.  It
> occasionally radiates up.  It radiates behind the thighs usually and has no feeling in
> posterior thighs.  He also complains of his feet having no reflexes and he tends to
> walk on his heels.  He also has no control of his bowel and bladder and he wears
> diapers.  He did self-catheterization for many years, but now he is using diapers.
> He was diagnosed to have arthritis around the rods on last MRI done at VA
> Hospital; he was recommended physical therapy, which has not helped.  He loses
> his balance easily and has been using cane for last four years.

(*PageID#* 950).  Dr. Oza ultimately concluded, "[b]ased on my objective findings, work-

11

related activities even at sedentary level will be difficult."  (*PageID#* 952).

## III.  <u>Administrative Review</u>

### A.  <u>"Disability" Defined</u>

To be eligible for SSI or DIB a claimant must be under a "disability" within the

definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The

definition of the term "disability" is essentially the same for both DIB and SSI.  *See*

*Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory

meaning, a "disability" includes only physical or mental impairments that are both

"medically determinable" and severe enough to prevent the applicant from (1) performing

his or her past job, and (2) engaging in "substantial gainful activity" that is available in

the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is

under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v.*

*Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v.*

*Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.  <u>Social Security Regulations</u>

Administrative regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence.  *See PageID##* 68-70; *see also* 20 C.F.R.

§ 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's

review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete

sequential review answers five questions:

12

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or
        equal the criteria of an impairment set forth in the Commissioner's Listing
        of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can he
        perform his past relevant work?

5.      Considering the claimant's age, education, past work experience, and
        residual functional capacity, can he or she perform other work available
        in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

C.      **ALJ McNichols' Decision**

Plaintiff last met the insured status requirements of the Social Security Act through

December 31, 2010.  (*PageID#* 80).

At Step 2 of the sequential evaluation, ALJ McNichols concluded that Reed has

the severe impairments of chronic low back pain; history of partial paraplegia of the

lower extremities, status post remote fractured spine; bladder incontinence; depression

and anxiety; and obesity.  (*PageID#* 81).

The ALJ concluded at Step 3 that Reed did not have an impairment or combination

of impairments that met or equaled one of the Listings.  (*PageID#* 83).

At Step 4, the ALJ evaluated Reed's residual functional capacity ("RFC") and

found the following:

> [S]ince March 30, 2005, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) subject to: occasional climbing of stairs; no climbing of ladders, ropes, and scaffolds; occasional balancing; frequent stooping, kneeling, crouching, and crawling; no exposure to hazards; the opportunity to alternate between sitting and standing at 30-minute intervals; no work on uneven surfaces; no requirement to maintain concentration on a single task for longer than 15 minutes at a time; use of a cane to ambulate; and ready access to restroom facilities (defined as no exposure to the public and no assembly-line work).

(*PageID#* 85).  The ALJ concluded at Step 4 that Reed was unable to perform any past relevant work.  (*PageID#* 91).

At Step 5, based on testimony from the VE, the ALJ concluded that – considering Plaintiff's age, education, work experience, and RFC – prior to June 20, 2011, Reed was capable of performing a significant number of jobs in the national economy.  (*PageID#* 92).

The ALJ's findings throughout his sequential evaluation led him to again conclude that Reed was not under a disability prior to June 20, 2011, and thus not eligible for DIB or SSI.  (*Id.*).

## IV.  Judicial Review

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains

14

evidence contrary to those factual findings.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.** **Discussion**

    **A.** **Plaintiff's Contentions**

Reed contends that the ALJ erred in rejecting the opinion of his treating physicians and instead relying on the findings of Dr. Vitols, a consulting physician.  (Doc. #9,

15

*PageID#* 1200).  The Commissioner argues substantial evidence supports the ALJ's

conclusion that Reed was not disabled prior to June 20, 2011, because "despite all of his

impairments, he could perform a limited range of sedentary work."  (Doc. #12, *PageID#*

1218).

### B. Medical Source Opinions

### 1.

### Treating Medical Sources

The treating physician rule, when applicable, requires the ALJ to place controlling

weight on a treating physician's or treating psychologist's opinion rather than favoring

the opinion of a nonexamining medical advisor or a one-time examining physician or

psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406

(6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004).  A treating physician's

opinion is given controlling weight only if it is both well supported by medically

acceptable data and if it is not inconsistent with other substantial evidence of record.

(*Id.*).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ

must still determine how much weight is appropriate by considering a number of factors,

including the length of the treatment relationship and the frequency of the examination,

the nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, and any specialization of the

treating physician."  *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. § 404.1527(c)(1)[3].  Yet the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight.  This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p.  Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.927(c), (e); *see also* Ruling 96-6p at *2-*3.

## 2.

## Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act."  Social Security Ruling 96-6p, 1996 WL 374180 at *2.  Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source.  *See id.* at *2-*3.  The Regulations explain, "In deciding whether you are disabled, we will always consider the medical

---

[3]20 C.F.R. §§ 404.1527 and 416.927 were amended effective March 26, 2012. The provisions governing the weight to be afforded a medical opinion were previously found at 20 C.F.R. §§ 404.1527(d) and 416.927(d).

opinions in your case record together with the rest of the relevant evidence we receive."
20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to
evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d)
including, at a minium, the factors of supportability, consistency, and specialization.  *See*
20 C.F.R. § 404.1527(e); *see also* Ruling 96-6p at *2-*3.

**C.    Analysis**

According to Reed, the ALJ erred in rejecting the opinion of his treating
physicians – Drs. Bennett, Schear, and Puthoff – and instead relying on the opinion of Dr.
Vitols and the non-examining State agency reviewers.  (Doc. #9, *PageID#* 1201).  The
Commissioner argues that the ALJ's decision should be affirmed because "[s]ubstantial
evidence supports the ALJ's conclusion that Plaintiff was not disabled because, despite
all of his impairments, he could perform a limited range of sedentary work."  (Doc. #12,
*PageID#* 1218).

Despite the ALJ's acknowledgment that "[t]here are several treating source
opinions that state the claimant is unemployable," he concluded, "in light of the medical
evidence of record, these opinions are found to be less than credible."  (*PageID#* 87).
The ALJ further determined, "[t]he finding that the claimant can do a limited or modified
range of sedentary work is consistent with the opinion of Dr. Vitols, who found the
claimant was not limited in his upper extremities in any way."  (*Id.*).  The ALJ noted the
following regarding Dr. Vitols' opinion:

Dr. Vitols found the claimant to have no muscle wasting, no gait alteration, and no

18

hemiparesis.  The claimant exhibited no atrophy or sensory deficit.  Muscle testing was 4/5 strength, and there was no limitation of motion.  Dr. Vitols did note the claimant had poor balance, but this is addressed in the RFC by not requiring the claimant to climb ropes, ladders, or scaffolds, to be around hazards, and to only occasionally balance.  Dr. Vitols did note the claimant used a cane for assistive ambulation, which is accommodated in the RFC.  X-rays taken at the time of the examination revealed that no gross deformities of the lumbar spine vertebra were evident.  Spaces were satisfactorily preserved.  Dr. Vitols noted the claimant had no further treatment or testing for his back after the 1985 accident following his initial treatment and rehabilitation.  In 1992, the claimant had bone spurs removed from his lumbar spine, but he returned to work as an electrician.  The claimant was able to grasp and manipulate with both hands satisfactorily, and there was no intrinsic atrophy of either hand.  There was full range of motion with his shoulders, elbows, wrists, hips, knees, and ankles.  There was tenderness of the spine, but straight leg raising was negative.  The findings of Dr. Vitols as to the claimant's physical capacity are given considerable weight as they are supported by medical evidence and clinical findings as well as the remaining evidentiary record, when considered in its entirety.

(*PageID#* 86).  A review of the record, however, indicates the ALJ's decision to reject the opinions of Reed's treating physicians and to rely upon the opinion of Dr. Vitols and the non-examining State agency reviewers is, as discussed below, not supported by substantial evidence and must be reversed.

The ALJ first erred in rejecting the March 2007 opinion of Dr. Bennett, who stated Reed was unemployable, and indicated he was markedly limited in his ability to push/pull, bend, reach, and handle, as well as extremely limited in his ability to make repetitive foot movements.  (*PageID#* 605).  Dr. Bennett noted Reed had hypertension, chronic back pain, two Harrington rods in his back, incontinence, ulcerative colitis, and migraines.  (*PageID#* 604).  She indicated his health status was "poor but stable."  (*Id.*).  The ALJ rejected her opinion, however, because she did not include additional records

and because Dr. Vitols, "found no such problems when he examined the claimant in May 2007." (*PageID#* 88). Problematic with the ALJ's finding, however, is that Dr. Vitols' findings are not actually inconsistent with Dr. Bennett's opinion. For example, Dr. Vitols found Reed's balance to be so poor and so unsteady – a point that actually tends to support Dr. Bennett's findings – that Dr. Vitols opted to forgo an examination of Reed's spinal motion while in the standing position. (*PageID#* 613). Moreover, Dr. Vitols' examination of Reed's spinal motion while in the seated position revealed "tenderness and increased muscle tone through the lumbar paravertebral musculature right and left and . . . generalized tenderness in the lumbosacral area." (*Id.*). Dr. Vitols also noted that Reed's "lower extremities reveal poor muscle tone and weakness right and left." (*PageID#* 614). Dr. Vitols' impression was partial paraplegia, lower extremities status post fractured spine; bowel and bladder incontinence; colitis as per history; and hypertension, as per history. (*Id.*). These findings tend to support Dr. Bennett's conclusions. The ALJ's finding that Dr. Vitols "found *no* such problems when he examined the claimant in May 2007," *PageID#* 88 (emphasis added), is therefore inaccurate and not supported by the record.

Dr. Schear, another one of Reed's treating physicians, indicated in February 2008 that Reed's ability to push/pull and bend was markedly limited, his ability to reach was moderately limited, and he was unemployable for "between 30 days and 9 months." (*PageID#* 636). The ALJ concluded, however, that "[t]he report and opinion of Dr. Schear are not credible in light of the medical evidence of record at the time and the

report of the examining orthopedic specialist." (*PageID#* 88). The ALJ erred again, however, by using the same unsupported conclusion regarding Dr. Schear's opinion that he used to reject Dr. Bennett's opinion, namely that it is inconsistent with Dr. Vitols' findings.

The ALJ also erred in rejecting the opinion of Reed's treating physician from the VA, Dr. Puthoff. On July 28, 2008, Dr. Puthoff completed a Basic Medical Form indicating Reed had chronic lumbar pain, lumbar radiculopathy, hypertension, and GERD. (*PageID#* 664). He noted Reed's ability to push/pull, bend, reach, and make repetitive foot movements were markedly limited. (*PageID#* 665). He believed Reed was unemployable for 12 months or more. (*Id.*). The ALJ, however, rejected Dr. Puthoff's opinion based on the fact "[t]here was no referral to an orthopedic surgeon for consultation; there was no injection therapy ordered; and the referral for physical therapy was optional, not recommended." (*PageID#* 88). According to the ALJ, such omissions meant Dr. Puthoff failed to create a treatment plan, which "makes one question Dr. Puthoff's assessment of the claimant's physical functional capacity." (*PageID#* 88). The ALJ, however, is not a medical expert and thus it remains unclear how Dr. Puthoff's decision not to refer Reed to an orthopedic surgeon for consultation, not to order injection therapy, and not to recommend physical therapy to Reed, somehow conclusively establishes that he had no treatment plan. Thus, instead of acknowledging Dr. Puthoff may not have deemed such treatment options to be medically necessary or otherwise beneficial at that time, the ALJ improperly inferred that Dr. Puthoff failed to create a

21

treatment plan for Reed due simply to the fact he did not include the types of treatment the ALJ appears to have believed should have been recommended at that time.  This was improper.  "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."  *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).  Not only is the ALJ's reasoning significantly flawed on many levels, but the resulting incorrect conclusion primarily used by the ALJ as the basis for rejecting Dr. Puthoff's opinion is also not supported by substantial evidence in the record.  For these reasons, the ALJ again erred.

Accordingly, for all the above reasons, Reed's Statement of Errors is well taken.

**B.**      **Reversal And Remand For Benefits**

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for further proceedings or to reverse and order an award of benefits. Under Sentence Four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A reversal of the ALJ's decision and a judicial award of benefits is warranted in

the present case, because the evidence of disability is strong while contrary evidence is

weak.  *See Faucher*, 17 F.3d at 176.  For example, a review of the record indicates the

three treating physicians' opinions are not only consistent with each other, but also

supported by the record as a whole, including many of Dr. Vitols' findings, as well as the

opinion of Dr. Oza, who evaluated Reed on August 18, 2011 at the request of the State

agency.  (*PageID#* 950).  In fact, Dr. Oza concluded, "[b]ased on my objective findings,

work-related activities even at sedentary level will be difficult."  (*PageID#* 952).[4]

Likewise, the VE testified she was "unable to identify competitive employment" for a

hypothetical worker with the limitations set forth by the ALJ who also needed to leave the

workstation and be off task for 10 to 15 minutes per hour.  (*PageID#* 130)(in reference to

Plaintiff's incontinence).  Accordingly, an Order remanding this case for benefits is

warranted.  *See Faucher*, 17 F.3d at 176; *see also Felisky v. Bowen*, 35 F.3d 1027 (6th

Cir. 1994).

### IT THEREFORE IS RECOMMENDED THAT:

1.      The Commissioner's final non-disability decision be reversed;

2.      Plaintiff Randolph Reed's applications for benefits, filed on March 7, 2007,
        be REMANDED to the Social Security Administration for payment of
        Disability Insurance Benefits and Supplemental Security Income consistent
        with the Social Security Act and based on the alleged disability onset date
        of March 30, 2005; and,

---

[4] Nonetheless, the ALJ only accepted her opinion as evidence that Reed would be unable to maintain full-time employment *after* June 20, 2011.  (*PageID#* 87).

23

      3.       The case be terminated on the docket of this Court.

November 24, 2014

s/Sharon L. Ovington
      Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).